[No. D006848. Fourth Dist., Div. One. Dec. 2, 1988.]

ANTHONY M. RIZZI, Plaintiff and Appellant, v.
BLUE CROSS OF SOUTHERN CALIFORNIA et al., Defendants
and Respondents.

COUNSEL

Stephen M. Shaw and Nicholas De Pento for Plaintiff and Appellant.

Gray, Cary, Ames & Frye, William S. Boggs, Charles L. Deem, Munger, Tolles & Olson and Daniel P. Garcia for Defendants and Respondents.

OPINION

**WORK, J.**—Anthony Rizzi appeals a summary judgment for Blue Cross of Southern California (Blue Cross) after the trial court concluded Rizzi's complaint—alleging, inter alia, violations of California Insurance Code section 790.03 in the denial of his claim for medical benefits under his employer's group insurance policy—was preempted by the Employee Retirement Income Security Act (ERISA; see 29 U.S.C.[1] § 1001 et seq.). We affirm the judgment because we conclude substantial evidence supports the trial court's finding the group insurance program was an employee welfare benefit plan established by Rizzi's employer under ERISA and the cause of action based on California Insurance Code section 790.03 is preempted by ERISA (§ 1144).

I

Rizzi's complaint alleges that in January 1975, Blue Cross issued an employees group health insurance policy to his employer, New Way Enterprises. After being notified by Blue Cross that he was insured, he incurred medical expenses, for which he filed a claim. However, Blue Cross allegedly failed and delayed to make medical benefit payments knowing he was entitled to them and with insufficient information to justify their action, misrepresented policy provisions, failed to promptly investigate and process his claims, did not attempt to settle his claims when liability was reasonably clear, and failed to provide a reasonable explanation for denying his claim. The complaint alleges Rizzi paid premiums for the insurance coverage.

II

### EXISTENCE OF AN ERISA PLAN

 Rizzi argues there was an insufficient showing his Blue Cross insurance is an employee welfare benefit plan subject to ERISA.

---

[1] All statutory references are to title 29 of the United States Code, unless otherwise specified.

*Statutory definitions*

ERISA protects " . . . participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." (§ 1001 (b); *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 44 [95 L.Ed.2d 39, 45-46, 107 S.Ct. 1549, 1551].)

ERISA defines an "employee welfare benefit plan" as including "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits. . . ." (§ 1002 (1).) ERISA applies to "any employee benefit plan if it is established or maintained—(1) by any employer engaged in commerce or in any industry or activity affecting commerce. . . ." (§ 1003 (a).)[2]

The Department of Labor identifies group insurance programs offered by an insurer to employees which are *not* under ERISA, stating: " . . . the terms 'employee welfare benefit plan' and 'welfare plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

"(1) No contributions are made by an employer or employee organization;

"(2) Participation [in] the program is completely voluntary for employees or members;

"(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

"(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than

---

[2] On appeal, Rizzi does not contend New Way was not engaged in interstate commerce or an industry affecting commerce. (See § 1002 (11).)

reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs." (29 C.F.R. § 2510.3-1(j).)

*Case precedent*

The issue is whether New Way "established or maintained" an "employee benefit plan" as required by sections 1002 and 1003.

Courts readily find the existence of an ERISA plan where an employer pays the premiums for its employees' insurance coverage *and* significantly administers the insurance program (i.e. processes claims). (See, e.g., opinion of this court in *Drummond* v. *McDonald Corp.* (1985) 167 Cal.App.3d 428, 432 [213 Cal.Rptr. 164].) As we discuss below, the evidence presented here does not show New Way processes claims or otherwise significantly administers the insurance policy. Thus, we examine federal precedent addressing what constitutes an ERISA plan in more borderline cases. ■ These decisions state the existence of an ERISA plan is a question of fact to be resolved in light of all surrounding facts and circumstances from the point of view of a reasonable person. (*Donovan* v. *Dillingham* (11th Cir. 1982) 688 F.2d 1367, 1373; *Credit Managers Ass'n* v. *Kennesaw Life & Acc. Ins.* (9th Cir. 1987) 809 F.2d 617, 625; *Kanne* v. *Connecticut General Life Ins. Co.* (9th Cir. 1988) 859 F.2d 96, 98.)[3]

Federal decisions use the Department of Labor regulation (29 C.F.R. § 2510.3-1(j)), quoted above, as an analytic springboard. To summarize, the regulation indicates ERISA plans do not include those under which the employer makes no contributions; participation is completely voluntary; the employer plays a limited role (i.e. does not endorse the plan, but only collects and remits premiums, and allows the insurer to publicize); and the employer receives no consideration other than compensation for administrative services.

Some federal cases indicate an ERISA plan may exist where the employer contributes toward the premiums, even when not otherwise significantly administering the program. (*Donovan* v. *Dillingham, supra,* 688 F.2d at pp. 1372-1375 [employer purchased group insurance either pursuant to collective bargaining agreement or continuing practice of purchasing insurance for class of employees]; *Local Union 2134, UMW of America* v. *Powhatan Fuel* (N.D.Ala. 1986) 640 F.Supp. 731, 734-735, vacated on other grounds in *Local Union 2134, UMW of America* v. *Powhatan Fuel* (11th Cir. 1987)

---

[3] Some federal cases discussed herein arise in the context of a suit brought alleging violations of duties under ERISA, whereas others arise in the context of federal preemption of a state action.

828 F.2d 710; see dicta in *Credit Managers Ass'n* v. *Kennesaw Life & Acc. Ins., supra,* 809 F.2d at p. 625 ["Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees."].)

In contrast, no ERISA plan was found where the employer made no contributions to the premiums, but entered into a "group unit purchase contract" with an insurance company, under which the employer permitted the insurance company to offer its annuity plans to the employees, and if the employee chose a plan, he directed the employer to contribute a portion of his salary to purchase the annuity. (*Otto* v. *Variable Annuity Life Ins.* (7th Cir. 1986) 814 F.2d 1127, 1129.) The court held the employer's sole involvement of allowing the insurance company, *along with other insurance companies,* to advertise its program and, if chosen by the employee, to collect and remit premiums, constituted only minimal, ministerial activities which did not render the plan one established or maintained by the employer. (*Id.* at p. 1135.)

On the other hand, ERISA plans have been held to be established even when no employer contributions are made, but the circumstances show significant employer endorsement of the program through involvement. In *Kanne* v. *Connecticut General Life Ins. Co., supra,* 859 F.2d at pages 98-99, the court reviewed a plan administered by an employer group of which the litigating employee's employer was a member. Pursuant to ERISA's requirements, the plan was established as a trust and the trust "purchased" a group health insurance from Connecticut General Life Insurance Company. The court noted the record was ambiguous as to whether the employer had contributed payments toward the employee's insurance coverage, or whether the employee's participation in the plan was voluntary or automatic. Further, the employer's function with respect to the plan was minor and ministerial, and no evidence suggested the plan was administered by a profitmaking concern. Notwithstanding the lack of evidence as to the employer's involvement, the court held an ERISA plan was established by the employer *group's* involvement, which group was considered an employer for purposes of ERISA under section 1002 (5). The court observed the employer group intended to create an ERISA plan, promoted it as an ERISA plan, and *as administrator,* endorsed it. *Kanne* concludes that because the employer group was more than a mere advertiser of group insurance, there need not be employer contributions or automatic employee coverage to bring the plan within ERISA.[4]

---

[4] Section 1002 (5) states: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."

Similarly, in *Shiffler* v. *Equitable Life Assur. Soc. of U.S.* (E.D.Pa. 1986) 663 F.Supp. 155, 160-161, affirmed *Shiffler* v. *Equitable Life Assur. Soc. of U.S.* (3d Cir. 1988) 838 F.2d 78, 82, footnote 4, the court found the existence of an ERISA plan, even though it was undisputed that criteria (1), (2), and (4) in the Department of Labor regulation were present, reasoning that a plan is excluded under ERISA only when *all* four criteria are met. The court held the plan did not meet the third criterion, since the employer endorsed the plan by presenting it as belonging to its benefit package, collecting the insurance premiums and forwarding them to the insurer, permitting the employees to discuss the plan with their supervisors, and administratively processing claims.

In contrast, no ERISA plan was found where the employer "endorsed" the policy sold by an insurance trust, but the employer had no control of the trust operation, contributed no funds on behalf of the employees, and the insurance brokers sold the policies directly to individual employees who paid the entire premiums. (*Hamberlin* v. *VIP Ins. Trust* (D.Ariz. 1977) 434 F.Supp. 1196, 1198;[5] see also *Baucom* v. *Pilot Life Ins. Co.* (M.D.N.C. 1987) 674 F.Supp. 1175, 1181 [although under the Department of Labor regulation mere endorsement may be enough to establish an ERISA plan, judicial precedent appears to require some degree of active involvement in the plan's founding or administration[6]].)

---

Apparently the court in *Kanne* concluded that the employer group involved therein (Associated Builders and Contractors) was a group acting for the employer. In contrast, other cases have indicated that an employer group which consists of heterogenous, unrelated employers is not an employer group recognized under ERISA. (See *Credit Managers Ass'n* v. *Kennesaw Life & Acc. Ins., supra,* 809 F.2d at p. 625; *Taggart Corp.* v. *Life & Health Benefits Admin.* (5th Cir. 1980) 617 F.2d 1208, 1210; *Donovan* v. *Dillingham, supra,* 688 F.2d at p. 1375.)

The *Kanne* opinion does not elaborate precisely what functions were undertaken by the employer group as the administrator of the plan.

[5] We note the district court in Arizona issuing the *Hamberlin* opinion is under the Ninth Circuit, the latter which issued the *Kanne* opinion finding establishment of an ERISA plan based on an employer group's "endorsement." The analysis in *Kanne* suggests an interpretation of the term "endorsement" as involving employer administration of a plan, not mere employer approval of a plan. Thus, *Kanne* does not appear to overrule *Hamberlin*.

[6] In *Baucom,* the court held that the defendants—who were seeking removal of an action filed in state court to federal court—had failed to carry their burden since no evidence had been presented as to how the plan was created or administered. The plaintiffs, who were members of a professional golf association and participants in a retirement plan, alleged they forwarded payments to an agent of Pilot Life Insurance Company. Other than an admission by the insurance agent that he was the administrator of the plan, there was no other evidence presented as to the administration of the plan; there was no evidence presented as to when the plan was established or the circumstances surrounding its establishment; and no copy of the plan itself was submitted. Thus, the court held assuming arguendo the golf association was an employee organization under ERISA, the defendants had failed to carry their burden to show

■ Finally, we note that an employer's failure to meet ERISA's requirements for establishing a plan (i.e., written instrument, named fiduciaries, public reports, etc.) does not mean the employer can escape ERISA's coverage, if it is decided a program is under ERISA. (*Scott* v. *Gulf Oil Corp.* (9th Cir. 1985) 754 F.2d 1499, 1503-1504.)[7]

Rizzi relies on *Taggart Corp.* v. *Life & Health Benefits Admin., supra,* 617 F.2d 1208, for the proposition that no ERISA plan exists where the employer's sole involvement is to purchase insurance for its employees. In *Taggart,* a corporation purchased insurance for its sole employee, and the court held ERISA does not regulate "bare purchases of health insurance where, as here, the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits." (*Id.* at p. 1211.) *Taggart* notes the employer did not participate in the day-to-day operation or administration of the program, and the corporation did no more than make payments to a purveyor of insurance, patently for tax reasons. (*Id.* at pp. 1210, 1211.)

In *Donovan* v. *Dillingham, supra,* 688 F.2d at page 1375, the Eleventh Circuit stated it agreed with *Taggart* if its holding is "interpreted to mean ERISA does not regulate purchases of health insurance when there is no welfare plan"; since the "purchase of insurance is only a method of implementing a plan, fund, or program and is evidence of the existence of a plan but is not itself a plan." On the other hand, *Donovan* disagrees with any interpretation of *Taggart* implying an ERISA plan can not be said to have been established if an employer only purchases a group health insurance policy. (*Ibid.*) The court in *Donovan* reasoned the purchase of insurance did not conclusively establish the existence of a plan, but it was evidence of a plan, and the purchase of a *group* policy covering a class of employees offered substantial evidence that a plan had been established. (*Id.* at p. 1373.) *Donovan* notes the peculiar facts in *Taggart*—i.e., the circumstances indicated the subscription simply involved the purchase of insurance by the employee for himself and his family. (*Donovan* v. *Dillingham,*

---

the employee organization established or maintained the plan. (*Baucom* v. *Pilot Life Ins. Co., supra,* 674 F.Supp. at pp. 1176-1178, 1181.)

[7] It has been held that if an employer merely purchases insurance for his employees, with no intent to set up a plan and no knowledge the insurance program was organized under ERISA, he cannot be deemed to have established an ERISA plan. (*Wayne Chemical, Inc.* v. *Columbus Agcy. Serv. Corp.* (7th Cir. 1977) 567 F.2d 692, 699.) The concern in *Wayne Chemical* was that the insurance trust not be allowed to escape a state law limiting the circumstances under which a dependent's coverage may be terminated. (*Id.* at p. 700.) Arguably *Wayne Chemical's* nonpreemption holding could have been reached under ERISA's savings clause (§ 1144 (b)(2)(A)), which exempts from preemption state laws regulating insurance, unless they conflict with ERISA's provisions. (See *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. 41, discussed *post.*) We question whether a test based on an employer's subjective intent is appropriate.

*supra,* 688 F.2d at p. 1375, citing the dist. ct. opinion *Taggart Corp.* v. *Efros* (S.D.Tex. 1979) 475 F.Supp. 124.) We believe *Donovan's* caution is justified, and that under some circumstances an employer's purchase of insurance may be enough to create an ERISA plan, depending on an evaluation of all circumstances.[8]

Some light is shed on the issue of what types of programs were intended to be governed by ERISA in a United States Supreme Court case arising in a different factual context, *Fort Halifax Packing Co., Inc.* v. *Coyne* (1987) 482 U.S. 1 [96 L.Ed.2d 1, 107 S.Ct. 2211]. There, the court held a state law requiring an employer to provide a one-time severance payment to employees in the event of a plant closing was not preempted by ERISA, since the statute neither established, nor required an employer to maintain, an employer welfare benefit *plan* under ERISA. (*Id.* at pp. 6-7 [96 L.Ed.2d at p. 8, 107 S.Ct. at p. 2215].) The court concluded an evaluation of both the express terms of ERISA and the legislative intent shows ERISA only preempts state laws relating to employee benefit *plans,* and not state laws merely relating to employee *benefits.* The court observed that the one-time severance pay statute did not require the employer to set up an administrative scheme—i.e., it did not require the employer to assume responsibility to pay benefits on a regular basis, and thus, the employer faced no periodic demand on its assets that created a need for financial coordination and control; and it did not require the employer to create an ongoing administrative program to process claims and pay benefits. (*Id.* at p. 12 [96 L.Ed.2d at p. 12, 107 S.Ct. at p. 2218].)

*Fort Halifax* concludes the statute did not implicate the regulatory concerns of ERISA.[9] That is, ERISA was enacted to require disclosure and

---

[8] We note that although the Department of Labor regulation states an ERISA plan does not exist if, inter alia, no contributions are made by the employer, it does not necessarily follow that if an employer does make contributions, a plan automatically exists. In 29 Code of Federal Regulations section 2510.3-1(a)(4), the Department of Labor qualifies its regulation by stating, "[s]ome of the practices listed in this section as excluded from the definition of 'welfare plan' or mentioned as examples of general categories of excluded practices are inserted in response to questions received by the Department of Labor and, in the Department's judgment, do not represent borderline cases under the definition in section 3(1) [§ 1002 (1)] of the Act. *Therefore, this section should not be read as implicitly indicating the Department's views on the possible scope of section 3(1)*." (Italics added.)

[9] *Fort Halifax* also concluded the statute did not conflict with the preemption purpose of ERISA. That is, the preemption purpose of ERISA was to establish a uniform set of regulations governing employee benefit plans, so that employers would not have to administer their plans differently in each state in which they have employees, and would thereby be encouraged to maintain and institute employee benefit plans. (*Id.* at pp. 10 [96 L.Ed.2d at p.10, 107 S.Ct. at pp. 2216-2217].) Since no administrative program was required by the statute, there was no potential that the employer would be faced with conflicting demands in the administration of its benefit plans in different states. (*Id.* at pp. 12-13 [96 L.Ed.2d at p. 12, 107 S.Ct. at p. 2218].)

provide safeguards with respect to the establishment, operation, and administration of employee benefit plans; to prevent abuses of the special responsibilities borne by those dealing with the plans; and to prevent self-dealing, imprudent investing, and misappropriation of plan funds. Since the focus of the statute is on the administrative integrity of benefit plans, it presumes some type of administrative activity is taking place. Thus, the court concluded that only "plans" involve administrative activity potentially subject to employer abuse; whereas the statute before it generated no such activity—i.e., there was no occasion to determine whether a "plan" is "operated" in the interest of the beneficiaries, because nothing is "operated" and no financial transactions take place that would be listed in an annual report. (*Id.* at pp. 16 [96 L.Ed.2d at p. 14, 107 S.Ct. at pp. 2219-2220].)

The court in *Fort Halifax* recognized that an employer assuming responsibility to pay benefits on a regular basis faces periodic demands on its assets creating a need for financial coordination and control. Although a program which only involves the monthly payment of premiums from the employer's funds to an insurance company does not create the same level of administrative activity as other more expansive employee benefit plans (i.e., employer plans which have the responsibility of actually processing claims and paying out benefits when a claim is made), nevertheless, it does require the employer to set aside funds and makes the employees dependent on the employer's fiscal responsibility.[10]

Applying by analogy the *Fort Halifax* analysis here, the line of demarcation between ERISA plans and non-ERISA plans depends on the level of involvement by the employer in the program so as to warrant federal regulation of the administrative integrity of the program. That is, when employers provide benefits to employees in a manner which involves the employer's administration of funds to be used for the employees, ERISA's concern with regulating the administrative integrity of the program arises. This in turn supports characterizing the program as an ERISA "plan."

Although factual differences and varying analytical approaches we have recited do not always coincide, the following general conclusions can be

---

[10]Furthermore, we note that in the United States Supreme Court decision in *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. at pages 43-44 [95 L.Ed.2d at pp. 44-46, 107 S.Ct. at p. 1551], the court's factual summary indicates it was apparently undisputed that an insurance program was an ERISA plan, through which program the employer collected and matched its employees' contributions to the plan and forwarded the funds to the insurer, and also supplied and forwarded claim forms. However, the insurer actually processed the claims. It does not seem that the mere ministerial duty of providing and transmitting claim forms should be a decisive factor in determining whether an ERISA plan exists; rather, the ERISA plan would appear to exist by virtue of the fact that the employer contributed funds to pay for the program regardless of whether the employees obtained the claim forms from the employer or directly from the insurer.

drawn from federal case precedent and the Department of Labor regulation. An employer may have (but has not necessarily) established an ERISA plan if his main involvement is to contribute to the payment of the premiums. If the employer does not contribute to the premiums, but merely transmits the employee's premiums without endorsing the policy or profiting from the program, no ERISA plan has been established. On the other hand, whether the employer contributes premiums or not, if the employer has endorsed the program in the sense that he is significantly involved in it, an ERISA plan may have been established. The ultimate determination depends on an evaluation of all the circumstances, keeping in mind ERISA's purpose of regulating an *employer's administration* of benefit plans.

### Evidence presented

 Turning to the facts of this case, Blue Cross submitted a declaration of the former president and owner of New Way—Troy Boal—stating New Way published various newspapers, one of which was mailed nationally to paid subscribers and included advertisements for products sold nationwide; in July 1975, New Way entered into a group service agreement with Blue Cross under which Blue Cross provided hospitalization and major medical benefits to eligible New Way employees; that an attached exhibit was a true and correct copy of a group service agreement; that Rizzi ceased active employment with New Way in approximately November 1976 after suffering a heart attack; and that New Way advised Blue Cross to terminate Rizzi's group health coverage effective February 1, 1977. Further, Blue Cross augmented the record on appeal with an excerpt from Rizzi's deposition in which he states he personally did not pay the insurance premiums, but they were paid by his employer. Rizzi does not dispute the plain interpretation of his deposition testimony is that the employer, not himself, contributed the money for insurance premiums, indicating only that he has no present recollection of whether that meaning is factually correct.

The exhibit attached to Boal's declaration is entitled "Group Hospital and Professional Service Agreement" between New Way and Blue Cross.[11] The agreement recites, inter alia, the following.

—A "subscriber" is an eligible employee under 65 years of age of the employer whose application for benefits has been accepted by Blue Cross and in whose name the identification card is issued by Blue Cross.

—The subscription charges may be increased upon 30 days written notice to the employer.

---

[11] We find no merit in Rizzi's arguments that the agreement was not adequately authenticated.

—The employer shall pay, monthly in advance, all subscription charges of its employees.

—If the employer fails to pay any installment of subscription charges, the agreement terminates without the necessity of notice to the employer or subscriber.

—If the subscriber ceases to be employed by the employer, and after the payment of at least one installment of the subscription charges in the manner prescribed for the employer, his individual certificate shall terminate automatically without notice. But, the subscriber shall be entitled, upon notice to Blue Cross within 15 days of the date of termination of employment, to apply for a conversion privilege at the subscription charges then in effect.

—If the agreement is terminated by the employer or the service, the individual certificates issued to the subscribers are terminated and no conversion privilege is available.

—The service may not cancel any individual certificate issued to any subscriber while the agreement is in force and effect and while the subscriber remains in the eligible class of employees of the employer and his subscription charges are paid.

—Any notice required of the service shall be deemed sufficient if mailed to the employer.

In opposition to Blue Cross's preemption claim, Rizzi submitted a declaration stating he understood he was not terminated but could have his job back when he recovered; he was never offered a plan entitled ERISA or covered by any regulation relating to ERISA; while he was employed in 1975, he enrolled in a group health insurance plan he understood would be less expensive than an individual plan; he never saw his employer administer or manage the group insurance plan; he corresponded with Blue Cross and received mail from Blue Cross about the plan; and the group plan was not offered as part of an overall employee benefit package.

We are satisfied the clear interpretation of Rizzi's depositional statements is that the employer contributed to the insurance premiums. In light of that fact in context with the form of the Blue Cross plan showing other employer controls over operation of the program, Blue Cross carried its burden at the summary judgment hearing to establish the existence of an ERISA plan. There is no countervailing demonstration of a triable issue of material fact.

## III

## FEDERAL PREEMPTION

■ The next issue is whether ERISA preempts actions brought under California Insurance Code section 790.03,[12] which, at the time this action was filed, created a private cause of action for unfair and deceptive acts or practices in the business of insurance. (See *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58].)

*Preemption of common law bad faith under Pilot Life case*

Section 1144 contains (1) a preemption clause, which provides that it supersedes all state laws relating to any employee benefit plan[13] (2) a savings clause, which exempts from preemption any state law which regulates insurance,[14] and (3) a deemer clause, which clarifies that a state law that purports to regulate insurance cannot deem an employee benefit plan to be an insurance company.[15] (*Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. at pp. 44-45 [95 L.Ed.2d at p. 46, 107 S.Ct. at p. 1552].)

In the *Pilot Life* case, the Supreme Court held that the *common law* cause of action for bad faith in an insurance contract was preempted by ERISA, stating that the state law did "relate to" an employee benefit plan so as to be covered under the preemption provision, but did not "regulate insurance" so as to be covered under the savings provision. (*Id.* at p. 47 [95 L.Ed.2d at p. 48, 107 S.Ct. pp. 1553-1554.)[16] The court reasoned that under a common

---

[12] California Insurance Code section 790.03, subdivision (h) defines unfair practices as including such acts as misrepresenting policy provisions, failing to act promptly, not attempting in good faith to fairly settle when liability is reasonably clear, failing to promptly explain a denial, etc.

[13] Section 1144 (a) [preemption clause] states: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975."

[14] Section 1144 (b)(2)(A) [savings clause] states: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

[15] Section 1144(b)(2)(B) [deemer clause] states: "Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies."

[16] If an ERISA plan exists, Rizzi does not contend his alleged common law causes of action are not preempted (i.e., duty of good faith, fraud, breach of fiduciary duty).

sense view of the phrase "regulates insurance," a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry, whereas common law bad faith was firmly planted in general principles of tort and contract law. (*Id*. at p. 48 [95 L.Ed.2d at p. 48, 107 S.Ct. at p. 1554].) Further, evaluating factors identified in the context of determining what constitutes "the business of insurance" under the McCarran-Ferguson Act,[17] the court reasoned that (1) although the common law bad faith did somewhat concern the policy relationship between the insurer and the insured, any such connection was tenuous at best since it did not define the terms of the relationship but merely allowed punitive damages under certain circumstances just as in any other contractual relationship; (2) common law bad faith law did not have the effect of spreading policyholder risk; and (3) it was not limited to the insurance industry since it was rooted in general principles available in all contract cases. (*Id*. at pp. 47-49 [95 L.Ed.2d at pp. 47-49, 107 S.Ct. at pp. 1553-1555].)

In a second component to its analysis, the court in *Pilot Life* stated that it must also interpret the savings clause by evaluating its role in ERISA as a whole. The court noted that since the state cause of action sought remedies for the improper processing of a claim for benefits under an ERISA-regulated plan, it must look to the legislative intent concerning the civil enforcement provisions provided by section 1132 (a). Examining the language and structure of the civil enforcement provisions as well as the legislative history, the court in *Pilot Life* was persuaded by the argument that Congress expressed an intent that the ERISA civil enforcement provisions be the exclusive vehicle for actions by beneficiaries asserting improper processing of a claim for benefits, and that various state causes of action for such claims would pose an obstacle to the purposes and objectives of Congress. (*Id*. at pp. 51-52 [95 L.Ed.2d at pp. 50-51, 107 S.Ct. at p. 1555].)

The court reasoned that the civil enforcement scheme (§ 1132 (a)[18]) was one of the essential tools for accomplishing ERISA's stated purposes, along

[17]The McCarran-Ferguson Act, provides in part: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." (15 U.S.C. § 1012 (a).) The criteria delineated to define the "business of insurance" under the McCarran-Ferguson Act are (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. (*Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. at p. 51 [95 L.Ed.2d at p. 50, 107 S.Ct. at pp. 1554-1555].)

[18]Section 1132 (a) states in part: "A civil action may be brought—(1) by a participant or beneficiary—[¶] (A) for the relief provided for in subsection (c) of this section, or [¶] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; [¶] (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [¶] (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or

with the provision requiring every employee benefit plan to give notice to a beneficiary whose claim has been denied and an opportunity for review (§ 1133), and a provision authorizing criminal penalties for violations of reporting and disclosure provisions (§ 1131). Under the civil enforcement scheme, a plan beneficiary may bring a cause of action for breach of fiduciary duty and seek removal of the fiduciary; may sue to recover benefits due, to enforce rights, or to clarify rights to future benefits; may obtain relief in the form of accrued benefits, a declaratory judgment, or an injunction; and may be awarded attorney's fees. (*Id*. at p. 53 [95 L.Ed.2d at p. 51, 107 S.Ct. at pp. 1555-1556].)

The court noted that the detailed provisions of the civil enforcement scheme set forth a comprehensive scheme which represented a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans, and the policy choices would be undermined if beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. Further, the legislative history demonstrated that ERISA's preemptive force with respect to suits to enforce benefit rights or to recover benefits was modeled after the Labor-Management Relations Act (LMRA), allowing suits in federal or state courts governed under the laws of the United States, and Congress was well aware that the LMRA displaced all state actions for violations of contracts between an employer and a labor organization even when the state action purported to authorize a remedy unavailable under the federal provision. (*Id*. at p. 56 [95 L.Ed.2d at p. 53, 107 S.CT. at p. 1557].) The court concluded the expectations expressed in the legislative history that a federal common law of rights and obligations under ERISA-regulated plans would develop, and the comparison of ERISA's civil enforcement scheme to the LMRA, would make little sense if the remedies available to beneficiaries under ERISA could be supplemented or supplanted by varying state laws.

The court in *Pilot Life* summarized its holding by stating: "Considering the common-sense understanding of the saving clause, the McCarran-Ferguson Act factors defining the business of insurance, *and, most importantly, the clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive,* we conclude that Dedeaux's state law suit asserting

---

practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; [¶] (4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title; . . . ."

Section 1132 (c) pertains to monetary penalties for refusals to supply requested information; section 1109 pertains to breach of fiduciary duty; and section 1025 (c) refers to reporting of benefit rights.

improper processing of a claim for benefits under an ERISA-regulated plan is not saved by [the savings clause], and therefore is pre-empted by [the preemption clause]." (*Id.* at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558]; italics added.)[19]

*Application of Pilot Life to California Insurance Code section 790.03*

In the recent Ninth Circuit case, *Kanne* v. *Connecticut General Life Ins. Co., supra,* 859 F.2d at page 100, the court assumed arguendo, without deciding, that unlike the common law bad faith cause of action, California Insurance Code section 790.03 is a state law regulating insurance under the savings clause.[20] Nevertheless, *Kanne* holds that under the second half of *Pilot Life's* analysis, the conclusion is inescapable that California Insurance Code section 790.03 is preempted by ERISA. We agree.[21]

If not for the alternative analysis in *Pilot Life,* which concludes Congress has evinced an intent that all suits alleging improper claims processing be governed only by federal law under ERISA, we would be inclined to hold that Insurance Code section 790.03 is a state law directly aimed at the insurance industry and integrally related to the relationship between the

---

[19] Given the court's holding that the savings clause did not rescue the state common law claim from the effect of the preemption clause, the court stated it did not need to reach the argument that the insurance company should be protected from direct state regulation under the deemer clause. (*Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. at p. 57, fn. 4 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558.)

[20] Some opinions of lower federal district courts in California have concluded Insurance Code section 790.03 is a state law regulating insurance within the meaning of the savings clause (*Graves* v. *Blue Cross of California* (N.D.Cal. 1988) 688 F.Supp. 1405, 1409-1412; *Lee* v. *Prudential Ins. Co. of America* (N.D.Cal. 1987) 673 F.Supp. 998, 1000-1001), whereas at least one has questioned that conclusion (see *Roberson* v. *Equitable Life Assur. Soc. of U.S.* (C.D.Cal. 1987) 661 F.Supp. 416, 422-424).

[21] Prior to the *Kanne* opinion, several lower federal district courts in California had reached the same conclusion. (See *Roberson* v. *Equitable Life Assur. Soc. of U.S., supra,* 661 F.Supp. at pp. 423-424; *Lee* v. *Prudential Ins. Co. of America, supra,* 673 F.Supp. at pp. 1001-1002.)

On the other hand, notwithstanding the second analysis in *Pilot Life,* several courts (none of which opinions are of current precedential value) have concluded that ERISA does not preempt actions brought under Insurance Code section 790.03. These include *Graves* v. *Blue Cross of California, supra,* 688 F.Supp. at pages 1412-1413, which the Ninth Circuit's decision in *Kanne* has effectively overruled (as well as several other federal district court opinions cited by Rizzi which predate *Pilot Life*); and *Goodrich* v. *General Telephone Co.* (1987) 195 Cal.App.3d 675, 683, 691 [241 Cal.Rptr. 640], for which review was granted to the California Supreme Court on December 23, 1987 (S002951). The Court of Appeal in *Goodrich* reasoned that it was illogical and in direct conflict with the unambiguous language of the ERISA savings clause to construe Insurance Code section 790.03 as being both within and without the scope of the preemption clause. Further, the court in *Goodrich* interpreted *Pilot Life* as premised on the finding the common law bad faith cause of action was not a law regulating insurance, and therefore *Pilot Life* did not need to decide, and did not decide, whether there were any implied limits to the savings clause.

insurer and the insured, and thus falls under the savings clause and is not preempted. However, we are bound by the statements in *Pilot Life* which emphasize that the most important basis for its preemption holding is that Congress intended ERISA's civil enforcement scheme pertaining to suits to enforce benefit rights to be exclusive and not to be supplemented by state law remedies. Regarding this component of *Pilot Life's* analysis, we see no basis to distinguish between a state common law, as opposed to statutory, remedy for improper claims processing.

Accordingly, Rizzi is limited to an action under ERISA and not under California Insurance Code section 790.03.

## DISPOSITION

The summary judgment is affirmed.

Wiener, Acting P. J., and Todd, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 1989. Mosk, J., and Kaufmann, J., were of the opinion that the petition should be granted.