[No. G015342. Fourth Dist., Div. Three. Mar. 23, 1998.]

SHANNON R. CAMPBELL et al., Plaintiffs, v.
CAL-GARD SURETY SERVICES, INC., Defendant and Respondent;
KELLY, HERLIHY & BANE, Objector and Appellant.

[No. G016109. Fourth Dist., Div. Three. Mar. 23, 1998.]

SHANNON R. CAMPBELL et al., Plaintiffs and Appellants, v.
PREVENT-A-THEFT INTERNATIONAL, LTD., Defendant and
Respondent.

**COUNSEL**

Kelly, Herlihy & Bane, Richard W. Bane, Brian G. Thorne and Andrew N. Chang for Plaintiffs and Appellants and for Objector and Appellant.

Lightfoot & Northrup and Robert W. Northrup, Jr., for Defendant and Respondent in No. G015342.

No appearance for Defendant and Respondent in No. G016109.

**OPINION**

**WALLIN, J.**—This case involves two separate appeals, Nos. G016109 and G015342, which have previously been ordered consolidated.[1] It arises from a bad faith action filed by Shannon R. Campbell[2] against two companies which issue automobile theft deterrent and insurance policies, and an automobile dealer. Campbell prevailed against one of the insurance companies and was awarded compensatory and punitive damages. No. G016109 is her appeal of the trial court's striking the punitive damages award and denying her attorney fees.[3] No. G015342 is Campbell's attorneys' appeal from an order sanctioning them for bringing suit against the other insurer.

I

*G016109: Facts*

No respondent's brief has been filed by Prevent-A-Theft International, Ltd., in No. G016109. Accordingly, we may accept as true the statement of facts set forth in Campbell's opening brief. (Cal. Rules of Court, rule 17(b); *Roman* v. *Usary Tire & Service Center* (1994) 29 Cal.App.4th 1422, 1431, fn. 5 [35 Cal.Rptr.2d 329]; *County of Lake* v. *Antoni* (1993) 18 Cal.App.4th 1102, 1104 [22 Cal.Rptr.2d 804].)

In January 1991, Campbell bought a new car from Campbell Motors, which sold her a theft-deterrent and insurance policy issued by Prevent-A-Theft International, Ltd. (PAT).[4] She paid $139 for the policy. A certificate stated she and her new car would be listed as an additional insured under a policy issued by United National Insurance Company. PAT promised to pay her $2,500 in the event her automobile was stolen. The policy required her to report the theft to PAT within 48 hours, and file a police report and insurance claim with her automobile insurance carrier within 30 days. To complete her claim with PAT, she had to send PAT copies of the police report and the insurance claim showing a payoff of at least $2,500.

In August 1991, while Campbell was staying with a friend, her car was stolen. She reported the theft to the police and her insurance carrier the day

---

[1] A third related appeal, No. G017648, was also consolidated with these cases. It was dismissed pursuant to California Rules of Court, rule 17(a).

[2] Campbell's parents, Kim and Diana Turskey, are also plaintiffs.

[3] Campbell also appealed a judgment of nonsuit in favor of United National Insurance Company. It subsequently settled with Campbell, and was dismissed from this appeal.

[4] We use the term "policy" for convenience. The purchaser of PAT's product receives decals which are put on the car's windows, and the vehicle's identification number is permanently engraved on all windows. As PAT's owner explained, the only way to obliterate the etching is to replace the window. A car thief generally will not want to spend the money to replace all the windows. The decals also make it easier for police to obtain the vehicle identification number.

it occurred. Campbell did not have the policy with her, and could not recall whom her theft deterrent and insurance policy was with, so she contacted Campbell Motors. It advised her the policy was with Cal-Gard Surety Services, Inc. (Cal-Gard), another theft-deterrent and insurance company, and gave her Cal-Gard's telephone number. Campbell called Cal-Gard. She was told not to do anything until she had all necessary claim documents, then she should send the papers to Cal-Gard. Campbell complied, sending Cal-Gard all the necessary documentation by the end of October. She was told it would take 30 to 60 days to process the claim.

In January 1992, Campbell telephoned Cal-Gard about her claim. She was told for the first time she had no policy with Cal-Gard. She contacted Campbell Motors, and was told her policy was with PAT. She called PAT, and was told to submit her claim and all supporting documents. Campbell mailed them twice to PAT, which had moved offices and not advised Campbell of its new address when she originally contacted it. Ultimately PAT received Campell's claim on February 12.

After sending the documents, Campbell called PAT. She was told that PAT would submit her claim to its insurance company, and she would receive payment in 30 to 60 days. Hearing nothing from PAT, Campbell telephoned in April and was told no payment had been sent to her and she should call PAT's president, Don Parker. She telephoned Parker on April 29. He told her PAT probably would not pay the claim because she had failed to report the theft within 48 hours. On May 7, Campbell wrote to Parker, but received no response. In September, Campbell's attorney wrote PAT requesting payment of the benefits. Again, there was no response.

At trial, the following facts came to light. Parker and one other person made up PAT's entire claims department. PAT had no written policies or procedures for handling claims. It conducted no investigation of Campbell's claim, or of her excuse for late notice of the claim. It never sent her claim to the insurer. Parker did nothing with Campbell's claim until she called him in April.

PAT's owner, Gregory Peck, testified that the insurer, United National Insurance Company, was paid solely for the use of its name in the certificate. Purchasers of PAT's policy were not listed as additional insureds on the United National Insurance Company policy. The insurer was not sent claims, nor did it participate in the investigation of claims. Parker had no claims experience when he was hired by PAT, and Peck did not look at claims himself.

Peck testified in his deposition that he knew of no way in which PAT was prejudiced by late reporting of claims. At trial he and Parker speculated it

could cause premiums to increase. However, PAT frequently paid claims which were reported more than 48 hours after the theft. Of the 40 claims paid in 1992, PAT took an average of 5 months to process them, but had no explanation for why it took so long. The claims files showed no efforts to communicate with its insureds. In each case, the file indicated the claim had been submitted to the insurer, when in fact claims were never submitted to the insurer.

Campbell's expert in insurance claim practices opined that PAT had acted completely unreasonably in handling Campbell's claim. He believed there could be no possible reason for requiring notification of the theft within 48 hours, and that provision was unreasonable. Furthermore, he did not believe the policy was adequately explained to purchasers. He concluded PAT's lengthy delay in processing Campbell's claim was unnecessary. PAT had violated industry standards by not having any policies or procedures for handling claims, conducting no investigation of Campbell's claim, failing to communicate with her at all about her claim, and essentially ignoring her, forcing her to resort to litigation.

The case was tried in phases. The parties stipulated that if Campbell prevailed on her cause of action for breach of the implied covenant of good faith and fair dealing, they would submit the amount of attorney fees to be awarded to the court. First, a jury returned a verdict for Campbell on her breach of contract claim and awarded her $2,500. Next, the jury found that PAT had acted unreasonably and in bad faith when it withheld benefits from Campbell and awarded her $7,288 for emotional distress. Finally, the jury found by clear and convincing evidence that PAT had acted with oppression, malice and fraud, and awarded Campbell $64,417 in punitive damages.

PAT brought a motion for judgment notwithstanding the verdict, asking the court to strike the punitive damages on the ground there was insufficient evidence to support the jury's finding of malice. It did not challenge the verdict on the bad faith cause of action. Campbell brought a motion for her attorney fees. The trial court granted PAT's motion and struck the award of punitive damages. It denied Campbell her attorney fees, stating it believed PAT's conduct in denying her claim was reasonable.

## II

### *G016109: Arguments*

#### A. *Judgment Notwithstanding the Verdict Striking Punitive Damages*

Campbell contends the trial court abused its discretion when it granted PAT's motion for judgment notwithstanding the verdict (Code Civ. Proc., § 629) and struck the award of punitive damages. We agree.

■ The trial court has limited discretion to grant a motion for judgment notwithstanding the verdict. It may grant it only when there is no substantial evidence to support the verdict. (*Teitel* v. *First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603 [282 Cal.Rptr. 916].) On appeal we resolve conflicts in the evidence and draw all reasonable inferences in favor of the verdict. (*Ibid.*)

■ Although the record does not indicate why the trial court struck the punitive damages, in the order denying attorney fees it indicated it disagreed with the jury's conclusion that PAT had acted in bad faith, finding instead that it had behaved reasonably in denying Campbell's claim. But there is substantial evidence to the contrary and it was not in the trial court's province to simply make different factual findings.

Campbell first asserts the punitive damages award is unassailable if there was sufficient evidence to support the underlying bad faith cause of action. She is incorrect. ■ A finding that the defendant violated the duty of good faith and fair dealing does not automatically support an award of punitive damages. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gaffney* v. *Downey Savings & Loan Assn.* (1988) 200 Cal.App.3d 1154, 1169 [246 Cal.Rptr. 421].) There must be clear and convincing evidence that the defendant is guilty of oppression, fraud or malice. (Civ. Code, § 3294, subd. (a); *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

"Malice" under Civil Code section 3294 "means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] . . . 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(2) & (3).)

■ There was sufficient evidence to support the jury's punitive damages verdict and the trial court should not have granted the motion for judgment notwithstanding the verdict. There was evidence that PAT engaged in despicable conduct and acted in conscious disregard of Campbell's and other insureds' rights. The policy contained misrepresentations. A purchaser was told he or she would be named as "an additional insured" under a policy written by a reputable insurer, but was not; PAT simply bought the right to

put the insurer's name in its certificates. When making a claim, the insureds were told their claim must first be submitted to the insurer for investigation, but PAT's owner testified, and the files showed, claims were not sent to the insurer. PAT had no policies or procedures for handling claims, and its "claims department" consisted of two persons with no prior claims experience. PAT's policy contained an unreasonably short notice period, 48 hours, for which PAT could offer no reason, and which it routinely disregarded in processing other claims.

There was also evidence PAT unreasonably delayed in processing and denying Campbell's claim. When Campbell originally called PAT in January to report the theft and explain the delay, there was no suggestion the claim would be denied. She was told her claim was being sent to "the insurer" for investigation. It was not. There was no subsequent communication from PAT. When Campbell telephoned, she was referred to Parker, who told her the claim would probably be denied. PAT then failed to respond to any of Campbell's letters. PAT undertook no investigation of Campbell's claim or her excuse for late reporting. The jury could reasonably infer from the evidence that PAT had an established practice of not investigating claims and delaying payment of them and therefore acted in conscious disregard of the rights of its insureds. (See *Hughes* v. *Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 847 [263 Cal.Rptr. 850].) The jury reasonably could have found it guilty of oppression and malice and awarded punitive damages to punish PAT. The trial court erred in striking the punitive damages award.[5]

B.   *Denial of Attorney Fees Under Brandt*

Campbell next contends the trial court erred when it refused to award her attorney fees. We agree.

In *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], the Supreme Court held that attorney fees, "reasonably incurred to compel payment of the policy benefits," are recoverable as an element of the damages in a bad faith action. (*Id.* at p. 815.) The court cautioned that the recoverable fees do not extend to fees incurred in pursuing the bad faith action itself: "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Id.* at p. 819.) The determination of the *amount*

---

[5]There was no challenge below, or here, to the amount of punitive damages awarded. Thus, we need not consider whether the amount is excessive.

of fees must be made by the trier of fact, generally the jury. Where the action includes both a contract claim for benefits, and a tort bad faith claim, the Supreme Court in *Brandt* encouraged parties to stipulate to "postjudgment allocation and award by the trial court . . . since the determination then would be made after completion of the legal services [citation], and proof that otherwise would have been presented to the jury could be simplified because of the court's expertise in evaluating legal services." (*Id.* at pp. 819-820.)

Here, the parties stipulated, as suggested by the Supreme Court in *Brandt*, to a postjudgment determination of the amount of fees to be awarded if Campbell prevailed on her bad faith cause of action. Campbell did prevail, and submitted the matter to the trial court. Without citing any authority, PAT objected solely on the ground that because Campbell's attorney was handling the matter on a contingency fee basis, Campbell had not *incurred* any attorney fees.

The trial court denied Campbell's attorney fees on the ground that PAT had not acted in bad faith, i.e., it had acted reasonably, although mistakenly, in denying her claim. This was an abuse of discretion. Campbell was entitled to her attorney fees in enforcing the contract as part of her damages in her successful bad faith action. The jury found in her favor and PAT did not challenge that finding. The trial court did not have authority to simply make different factual findings. It should have awarded her the attorney fees. Campbell concedes that she is only entitled to her attorney fees attributable to the contract cause of action. At trial she documented that amount to be $13,010. PAT did not challenge the reasonableness of the amount.

### III

#### G015342: Facts

Campbell also sued Cal-Gard for negligence. Cal-Gard's demurrer was sustained, and Campbell amended her complaint. In her amended complaint she alleged that in reliance on information from Campbell Motors, she reported the theft of her car to Cal-Gard on August 15, 1991. Cal-Gard did not tell her she was not insured with it and instructed her to send it all the pertinent documents. Cal-Gard knew it had only just begun to sell its insurance through Campbell Motors, yet knowing its relationship with Campbell Motors was new, it did not investigate whether Campbell had bought its policy or that of its predecessor, PAT. Campbell sent Cal-Gard the reports and insurance claims in late October, and was told it would take 30 to 60 days to process. It was not until Campbell called Cal-Gard on January 7, 1992, that Cal-Gard informed her she was not insured with it.

Campbell alleged Cal-Gard had a duty not to increase the risk of loss to her. By leading her to believe it was her theft protection carrier, and failing to promptly verify her coverage, Cal-Gard contributed to her failure to timely report the loss to PAT.

The trial court sustained Cal-Gard's demurrer without leave to amend, concluding Campbell had failed to allege any duty on the part of Cal-Gard. Cal-Gard sought sanctions against Campbell under Code of Civil Procedure section 128.5 for having pursued a frivolous action against it. In opposition, Campbell submitted declarations of two attorneys specializing in tort litigation. Each stated he had consulted with Campbell's attorneys prior to commencement of the litigation and upon being given the hypothetical facts, concluded it was appropriate to sue Cal-Gard on a voluntary assumption of duty theory. Her attorney stated he had done extensive legal research and had found cases which he believed supported her claim.

At the hearing on sanctions, counsel for Cal-Gard stated the element of bad faith was based solely on the lack of merit of the case, not on any bad intention in pursuing it. The trial court agreed, stating that despite all of counsel's efforts he had simply "misdiagnosed" the case; "I don't think a reasonable lawyer would have brought the case if you had thought it through." It awarded Cal-Gard $3,000 in sanctions against Campbell's attorneys.

## IV

### G015342 Argument: Abuse of Discretion to Award Sanctions

Campbell's attorneys contend the trial court abused its discretion when it sanctioned them under Code of Civil Procedure section 128.5. We agree.

Code of Civil Procedure section 128.5 authorizes the trial court to sanction a party, the party's attorney, or both for "bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." (Code Civ. Proc., § 128.5, subd. (a).) A bad faith action or tactic is considered "frivolous" if it is "totally and completely without merit" or instituted "for the sole purpose of harassing an opposing party." (Code Civ. Proc., § 128.5, subd. (b)(2).) On appeal we consider only whether the trial court abused its discretion in ordering sanctions. (*Dolan* v. *Buena Engineers, Inc.* (1994) 24 Cal.App.4th 1500, 1504 [29 Cal.Rptr.2d 903].)

To impose sanctions under Code of Civil Procedure section 128.5, there must be a showing that Campbell's action was meritless or frivolous *and* that

it was pursued in bad faith. (*Monex International, Ltd.* v. *Peinado* (1990) 224 Cal.App.3d 1619, 1624-1625 [274 Cal.Rptr. 667] ["[W]here a trial court concludes a party's motion has been brought in bad faith *and* is frivolous, and sufficient evidence supports that conclusion, the imposition of sanctions will be upheld on appeal" (italics added)]; see also *Llamas* v. *Diaz* (1990) 218 Cal.App.3d 1043, 1047 [267 Cal.Rptr. 427]; *Bruno* v. *Superior Court* (1990) 219 Cal.App.3d 1359 [269 Cal.Rptr. 142]; *Summers* v. *City of Cathedral City* (1990) 225 Cal.App.3d 1047 [275 Cal.Rptr. 594].) An evil motive is not required; subjective bad faith may be inferred from the prosecution of a frivolous action. (*West Coast Development* v. *Reed* (1992) 2 Cal.App.4th 693, 702 [3 Cal.Rptr.2d 790].)

There simply is no evidence here to support the conclusion that Campbell's attorneys acted in bad faith. At best it shows they were mistaken as to the viability of their cause of action. As the trial court put it, they "misdiagnosed" the case. The attorneys stated they had done extensive research on the tort doctrine of voluntary assumption of duty.[6] They conferred with tort litigation specialists who advised that Campbell could state a negligence cause of action based on the theory that by instructing Campbell not to act until she had submitted all documents to it, accepting her claim, and not acting to advise her she was not insured with it, Cal-Gard had assumed a duty towards her.

At most Campbell's attorneys may have been negligent in their assessment of the viability of her claim,[7] but that does not amount to bad faith. (See *Abbett Electric Corp.* v. *Sullwold* (1987) 193 Cal.App.3d 708, 713 [238 Cal.Rptr. 496].) The trial court's power to punish "should be used most sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650-651 [183 Cal.Rptr. 508, 646 P.2d 179].) "To this end '. . . an attorney needs only a reasonable and honest belief in the viability of each theory and the evidence supporting that theory, not a

---

[6]"Firmly rooted in the common law lies the concept that although one individual need do nothing to rescue another from peril not of that individual's own making, nevertheless, 'He who undertakes to do an act must do it with . . . care.' [Citations.] '[I]f the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act, and will thereafter be liable for negligent acts or omissions . . . .' [Citation.] 'If the conduct of the actor has brought him into a human relationship with another, of such character that sound social policy requires some affirmative action or some precaution on his part to avoid harm, the duty to act or take the precaution is imposed by law. . . . Where a person is under the special protection of another, the latter is bound to exercise reasonable care to prevent harm to him, and this duty may include protection from the dangerous conduct of third persons.'" (*Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 238-239 [60 Cal.Rptr. 510, 430 P.2d 68].)

[7]We decline to consider whether Campbell indeed had a viable cause of action against Cal-Gard. She has not appealed Cal-Gard's dismissal from the action.

conviction his client will prevail, to justify filing a claim or defense. [Citation.]' " (*Talavera* v. *Nevarez* (1994) 30 Cal.App.4th Supp. 1, 6 [35 Cal.Rptr.2d 402], quoting *Grindle* v. *Lorbeer* (1987) 196 Cal.App.3d 1461, 1467-1468 [242 Cal.Rptr. 562].)

## V

### *Disposition*

#### *G016109*

We reverse the trial court's order granting the motion for judgment notwithstanding the verdict and reinstate the original judgment on the jury's verdict. We reverse the trial court's order denying Campbell's attorney fees on her contract cause of action and remand to the trial court with directions to enter a new order awarding Campbell $13,010 in attorney fees. Appellants are awarded their costs on appeal.

#### *G015342*

We reverse the trial court's sanctions order. Appellants are awarded their costs on appeal.

Sills, P. J., and Crosby, J., concurred.